IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARK GLENNON,<br><br>         Plaintiff,<br><br>v.<br><br>BRANDON JOHNSON, *in his official capacity as Mayor of Chicago*; MELISSA CONYEARS-ERVIN, *in her official capacity as Chicago City Treasurer*; CITY OF CHICAGO; CHARLES SCHMADEKE, SEAN BRANNON, STEPHEN FERRARA, and DIONNE HAYDEN, *in their official capacity as Chairman and Members of the Illinois Gaming Board*; BALLY'S CHICAGO INC.; BALLY'S CHICAGO OPERATING COMPANY, LLC; and BALLY'S CORPORATION,<br><br>         Defendants. | Case No. 1:25-cv-1057<br><br>Plaintiff's Memorandum of Law in Support of Emergency Motion for Preliminary Injunction and Temporary Restraining Order |

Reilly Stephens
Bridget Conlan
LIBERTY JUSTICE CENTER
7500 Rialto Blvd., Suite 1-250
Austin, TX 78735
(512) 481-4400
rstephens@ljc.org
bconlan@ljc.org
 *Counsel for Plaintiff*

**Introduction**

Plaintiff Mark Glennon submits this Memorandum in support of his Emergency Motion for a Temporary Restraining Order, asking this Court to enjoin the Initial Public Offering of Bally's Chicago Inc., whose S-1 filing is attached to this Motion as **Exhibit A**, participation in which is restricted, at the behest of the City of Chicago, to members of approved races and gender identities, and which is set to distribute on February 7, 2025.

In 2022, the City of Chicago ("City") and Bally's Chicago Operating Company, LLC ("Bally's") entered into a Host Community Agreement ("Agreement"), attached to this motion as **Exhibit B**. The Agreement requires that Bally's discriminate on the basis of sex and racial classification in all facets of the casino project, from initial construction, to vendor selection, employee recruitment and hiring, Board composition, and ownership of the casino project. To meet the Agreement's 25% minority ownership requirement, Bally's has put forth an Initial Public Offering ("IPO") which can only be purchased by individuals who meet the "Qualification Criteria" set by the City. This requires that the purchaser be either a woman or a minority, as defined by the City of Chicago.

Plaintiff Mark Glennon attempted to participate in the Bally's IPO but was excluded because he is a white male. He challenges the constitutionality of the minority preference in the Qualification Criteria, set by the Agreement and defined by the Municipal Code of Chicago, which excludes him from participating in the Bally's IPO and has brought an action for declaratory and injunctive relief to vindicate his right to the equal protection of the law.

**Facts**

In 2021, the City of Chicago began soliciting proposals to compete for the right to develop the first integrated casino resort in the City, pursuant to the Illinois Gambling Act, 230 ILCS

1

10/1 et seq., which authorizes the City to issue a single casino owner's license.[1] Five proposals were received and three finalists were chosen: The Hard Rock, Rivers, and Bally's. Those three bids were analyzed by the Chicago City Council casino committee (chaired Aldpeople Thomas Tunney and Jason Ervin) who recommended a selection to then-Mayor Lori Lightfoot, who then chose a bid.[2] In the summer of 2022, Bally's Corporation was ultimately selected by the Mayor to open a casino on the site of the Tribune Publishing Center in the River West neighborhood. While all the bids attempted to placate the City's discriminatory policy objectives, Bally's went above and beyond to ensure it would satisfy the City's demands.

Defendants negotiated a comprehensive Host Community Agreement to memorialize the agreed upon terms. *See* **Exhibit B**. The Agreement was then evaluated by an Alderman special committee, as well as the entire City Council, before receiving their final approval. The formal development process could not begin until receiving approval from the City Council and approval for a casino license from the Illinois Gaming Board.[3]

The City, enforcing the requirements of the Illinois Gambling Act 230 ILCS 10/1 et seq., conditioned project approval on the inclusion of various "minority preferences" in the Host Community Agreement. These demands did not and do not claim to remedy any particular past discrimination. The Agreement requires discrimination on the basis of sex and racial classification in all facets of the casino project. For example, Bally's is required to discriminate in sourcing with a preference for Minority owned businesses ("MBE") and Women-owned businesses

---

[1] CBS News, Lightfoot's Office Unveils Five Bids For A Chicago Casino; Public Meeting on Proposals Set for Dec. 16, November 19, 2021, https://www.cbsnews.com/chicago/news/chicago-casino-proposals-mayor-lori-lightfoot-ballys-hard-rock-rivers-rush-street-gaming/

[2] Hermene Hartman, Casino in Chicago: Here's What You Need to Know About the 3 Proposed Sites, The Triibe, April 28, 2022, https://thetriibe.com/2022/04/casino-in-chicago-here-is-what-you-need-to-know-about-the-3-proposed-sites/

[3] NBC 5 Chicago, Bally's River West Wins Chicago Casino Bid, Here's What We Know and What Happens Next, May 5, 2022, https://www.nbcchicago.com/news/local/ballys-river-west-wins-chicago-casino-bid-heres-what-we-know-and-what-happens-next/2824938/

("WBE") and must hire a "Diversity, Equity and Inclusion expert in sourcing, monitoring, compliance and contracting MBE, WBE, VBE and BEPD vendors[.]" See **Exhibit B** at 066-069. Through the Agreement the City requires Bally's to engage in race- and sex-based discrimination in workforce recruiting and hiring, including promises that Bally's "will take commercially reasonable efforts to maintain a target goal of hiring 60% Minorities for operation of the Casino[.]" **Exhibit B** at 074; *see also* 084. Through the Agreement the City also requires that "40% of seats on the Board will be reserved for Minorities, no later than twelve months following commencement of the Term or such later date as may be determined by the City to allow for Illinois Gaming Board approval, which commitment will continue for the life of the agreement." **Exhibit B** at 115.

> Most relevant here, the Agreement also requires that
>
> 25% of the Project equity will be owned by Minority individuals and Minority-Owned and Controlled Businesses no later than twelve months following commencement of the Term or such later date as may be determined by the City, and will continue for no less than five years thereafter. Additionally, Developer shall provide commercially reasonable efforts to locate qualified Minority individuals or Minority-Owned and Controlled Businesses who wish to buy an interest in Developer in an effort to assist any Minority individuals or Minority-Owned and Controlled Businesses who may wish to sell their interest in Developer.
>
> **Exhibit B**, 115.

For purposes of the ownership provision of the Agreement, the term "Minority" "means an individual considered to be a minority pursuant to MCC 2-92-670(n), 'Definitions: Minority,' as it may be amended from time to time, or a 'woman' as defined in the Act. This includes, but is not limited to: African-Americans, Hispanics, Asian-Americans, and American Indians, as defined by that ordinance." *Id*.

To meet the 25% minority ownership requirement imposed by the Agreement, Bally's has registered an Initial Public Offering ("IPO") with the Securities and Exchange Commission

3

("SEC") of 10,000 shares. Despite its use of the term "public offering," this offer is only available to investors who meet the "minority" definition imposed by the City through the Agreement, also called "Class A Qualification Criteria" in the associated S-1 filing for the registered securities offering, described as follows:

> The Class A Qualification Criteria include, among other criteria, that the person:
> - If an individual, must be a women;
> - If an individual, must be a Minority as defined by MCC 2-92-670(n)(see below); or
> - If an entity must be controlled by women or Minorities.
> MCC 2-92-670(n), in turn defines Minority as:
> - Any individual in the following racial or ethnic groups:
>   o African-Americans or Blacks (including persons having origins in any of the Black racial groups of Africa);
>   o American Indians (including persons having origins in any of the original peoples of North and South America (including Central America) and who maintain tribal affiliation or community attachment);
>   o Asian-Americans (including persons whose origins are in any of the original peoples of the Far East, Southeast Asia, the islands of the Pacific or the Northern Marianas or the Indian Subcontinent);
>   o Hispanics (including persons of Spanish culture with origins in Mexico, South or Central America or the Caribbean Islands, regardless of race); and
> - Individual members of other groups, including but not limited to Arab-Americans, found by the City of Chicago to be socially disadvantaged by having suffered racial or ethnic prejudice or cultural bias within American society, without regard to individual qualities, resulting in decreased opportunities to compete in Chicago area markets or to do business with the City of Chicago. Qualification under this clause is determined on a case-by-case basis and there is no exhaustive or definitive list of groups or individuals that the City of Chicago has determined to qualify as Minority under this clause. However, in the event the City of Chicago identifies any additional groups or individuals as falling under this clause in the future, members of such groups would satisfy the Class A Qualification Criteria.
>
> If there are any changes to the groups included in MCC 2-92-670(n), and consequently to the Class A Qualification Criteria, prior to the closing of this offering, we will communicate such changes by filing an amendment to this prospectus with the Securities and Exchange Commission (the "SEC"). **Exhibit A** at 009.

Not only does the IPO limit participation to only those who meet the minority criteria, but it also offers subsidized shares to applicants who meet the minority criteria. The applicant can pay

4

as little as $250 for a share valued at $25,000, with the difference subsidized by a non-recourse loan from Bally's. **Exhibit A** at 009.

The application to participate in the IPO explicitly requires applicants to certify that they meet the "Class A Qualification Criteria" "pursuant to the Host Community Agreement as agreed with the City of Chicago." *See* Compl. ¶ 31. The Qualification Criteria requires that a purchaser must be a minority, woman, or an entity majority-owned by minority persons or women. Those who do not meet the Qualification Criteria cannot purchase shares. On January 24, 2025, Plaintiff Mark Glennon applied to participate in the Bally's IPO and was not permitted to apply to participate solely because he does not identify as a minority or a woman.

## Standard of Review

The purpose of emergency injunctive relief is "to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *Platinum Home Mortg. Corp. v. Platinum Fin. Group, Inc.*, 149 F.3d 722, 726 (7th Cir. 1998) (citing *Faheem-El v. Klincar*, 841 F.2d 712, 717 (7th Cir. 1988)). "The standards for a temporary restraining order and the standards for a preliminary injunction are identical." *Charter Nat'l Bank & Tr. v. Charter One Fin., Inc.*, No. 01 C 0905, 2001 U.S. Dist. LEXIS 6531, at *3 (N.D. Ill. May 15, 2001).

Plaintiffs are entitled to preliminary relief where (1) they will otherwise suffer irreparable harm; (2) traditional legal remedies are inadequate; and (3) there is at least some likelihood of success on the merits. *HH-Indianapolis, LLC v. Consol. City of Indianapolis,* 889 F.3d 432, 437 (7th Cir. 2018). If a plaintiff makes such a showing, the court proceeds to a balancing analysis, weighing the harm a denial of the preliminary injunction would cause the plaintiff against the

5

harm of a grant to the defendant. *Mays v. Dart,* 974 F.3d 810, 818 (7th Cir. 2020). This is a sliding scale approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa. *Id.*

## Argument

### I. Plaintiff is likely to succeed on the merits.

Plaintiff is likely to succeed on the merits of his claim that Defendants are unconstitutionally discriminating on the basis of race and sex by excluding him from participation in the Bally's IPO simply because he is white and male.

"The Equal Protection Clause of the Fourteenth Amendment protects individuals from governmental discrimination. The typical equal protection case involves discrimination by race, national origin or sex." *Swanson v. City of Chetek*, 719 F.3d 780, 783 (7th Cir. 2013). The Fourteenth Amendment prohibits municipalities from discriminating on the basis of race or ethnicity. *See McNamara v. City of Chi.*, 959 F. Supp. 870, 872 (N.D. Ill. 1997).

Defendants deprive Plaintiff of his Fourteenth Amendment right against discrimination on the basis of sex and race by requiring that participation in the Bally's IPO is limited only to women or racial minorities as defined by the Municipal Code of Chicago. The requirements of the Agreement operate to specifically exclude white males from ownership participation in the only casino project in the City.

The discriminatory requirements of the Agreement are imposed by the City of Chicago, a government actor. In implementing the Agreement, depriving Plaintiff of his Fourteenth Amendment rights, Defendants and their agents are acting under color of state law. In the Agreement, the definition of "minority" is set by the Municipal Code of Chicago, MCC 2-92-670 (n), and the definition of "woman" is determined by MCC 2-92-680(v). The race and sex quotas Bally's

6

agreed to were set by the City—indeed, the 25% non-white ownership requirement is an aspiration imposed by state law—the Illinois Gambling Act required bids to attempt to meet it. And the City requires that Bally's enforce the discriminatory provisions of the Agreement under threat of severe monetary penalty. Failure to enforce the discriminatory provisions would constitute an Event of Default by Bally's, entitling the City to terminate the Agreement despite the significant financial investment already made by Bally's.

Where Bally's acts to implement the discriminatory provisions of the Agreement, it is a state actor. Private action can become state action when "private actors conspire or are jointly engaged with state actors to deprive a person of constitutional rights; where the state compels the discriminatory action; when the state controls a nominally private entity; when it is entwined with its management or control; when the state delegates a public function to a private entity; or when there is such a close nexus between the state and the challenged action that seemingly private behavior reasonably may be treated as that of the state itself." *Genova v. Kellogg*, No. 12 C 3105, 2015 U.S. Dist. LEXIS 82770, at \*10 (N.D. Ill. June 25, 2015) (citing *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 815-16 (7th Cir. 2009). Through the Agreement imposed by the City, Bally's is being compelled by the government to discriminate to fulfill the government's discriminatory policy goals, and their actions are inextricably intertwined with those government policies.

The Supreme Court has held that "*all* racial classifications [imposed by government] . . . must be analyzed by a reviewing court under strict scrutiny." *Johnson v. California*, 543 U.S. 499, 505, 125 S. Ct. 1141, 1146 (2005) (citing *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227, 132 L. Ed. 2d 158, 115 S. Ct. 2097 (1995)).

7

"Under strict scrutiny, the government has the burden of proving that racial classifications 'are narrowly tailored measures that further compelling governmental interests.' We have insisted on strict scrutiny in every context, even for so-called 'benign' racial classifications, such as race-conscious university admissions policies, race-based preferences in government contracts, and race-based districting intended to improve minority representation." *Johnson v. California*, 543 U.S. 499, 505 (2005) (internal citations omitted).

The race-based preference imposed by the Agreement is not narrowly tailored to further a compelling government interest. When the government creates race-based policies to remedy racial discrimination, it must only do so "informed by data that suggest intentional discrimination." *Vitolo v. Guzman*, 999 F.3d 353, 361 (6th Cir. 2021). Broad disparities "are not nearly enough." *Id.* The fact that there may be a history of social disadvantage for one or more groups does not justify resort to racial classification. "[W]hen a legislative body chooses to employ a suspect classification, it cannot rest upon a generalized assertion as to the classification's relevance to its goals. A governmental actor cannot render race a legitimate proxy for a particular condition merely by declaring that the condition exists." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 500-501 (1989) (citing *McLaughlin v. Florida*, 379 U.S. 184, 190-193 (1964)).

Creating new forms of discrimination to remedy old ones is not a solution to past racism. Rather, "[t]he way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Community Schools v. Seattle School District No. 1,* 551 U.S. 701, 748 (2007). "Racial classifications are antithetical to the Fourteenth Amendment, whose 'central purpose' was 'to eliminate racial discrimination emanating from official sources in the States.'" *Shaw v. Hunt*, 517 U.S. 899, 907 (1996) (quoting *McLaughlin v. Florida*, 379 U.S. 184, 192 (1964)). "Distinctions between citizens solely because of their ancestry are by their very nature

8

odious to a free people." *Rice v. Cayetano,* 528 U.S. 495, 517 (2000) (quoting *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943)).

"A law that grants preferential treatment on the basis of race or ethnicity does not deny the equal protection of the laws if it is (1) a remedy for (2) intentional discrimination committed by (3) the public entity that is according the preferential treatment . . . and (4) discriminates no more than is necessary to accomplish the remedial purpose." *Builders Ass'n of Greater Chi. v. Cty. of Cook*, 256 F.3d 642, 644 (7th Cir. 2001). The Seventh Circuit used this framework to analyze a Cook County ordinance that required a minimum of 30% of the total value of any County construction contract be awarded to Minority- and Women-Owned Businesses, ultimately striking down the discriminatory ordinance as a denial of equal protection. *Id*.

There, as here, the government had no credible evidence that it had intentionally discriminated against the groups favored by the program, nor credible evidence that the County had been complicit in private discrimination against the favored groups. *Id*. And, as the Court pointed out in that case "if the County *had* been complicit in discrimination by prime contractors, still it would be odd to try to remedy that discrimination by requiring discrimination in favor of minority *stockholders,* as distinct from employees. That is a standard feature of minority set-aside programs, but a puzzling one in terms of the stated objectives of such programs." *Id*. There, as here, the proposed remedy was not appropriately tailored to satisfy the stringent requirements necessary to justify a race-based classification. As Judge Posner explained,

> A state or local government that has discriminated just against blacks may not by way of remedy discriminate in favor of blacks *and* Asian-Americans *and* women. *City of Richmond v. J.A. Croson Co., supra,* 488 U.S. at 506; *Associated General Contractors of Ohio, Inc. v. Drabik, supra,* 214 F.3d at 737; *Monterey Mechanical Co. v. Wilson,* 125 F.3d 702, 714-15 (9th Cir. 1997). Nor may it discriminate more than is necessary to cure the effects of the earlier discrimination. *Majeske v. City of Chicago,* 218 F.3d 816, 820, 823 (7th Cir. 2000); *McNamara v. City of Chicago, supra,* 138 F.3d at 1222-23. Nor may it continue the remedy in force indefinitely, with

9

> no effort to determine whether, the remedial purpose attained, continued enforcement of the remedy would be a gratuitous discrimination against non-minority persons. *Chicago Firefighters Local 2 v. City of Chicago, supra,* 249 F.3d at 654-55; *Danskine v. Miami Dade Fire Dept.,* 253 F.3d 1288, 2001 WL 649502, at *12-13 (11th Cir. 2001); *Boston Police Superior Officers Federation v. City of Boston,* 147 F.3d 13, 24-25 (1st Cir. 1998); *Middleton v. City of Flint,* 92 F.3d 396, 411-12 (6th Cir. 1996). All three points are closely related (the second and third particularly so, as we'll see). They amount to a requirement of a close match between the evil against which the remedy is directed and the terms of the remedy. As the cases say, the remedy must be "narrowly tailored" to the wrong that it seeks to correct.

*Builders Ass'n of Greater Chi. v. Cty. of Cook*, 256 F.3d 642, 646 (7th Cir. 2001).

The Host Community Agreement relies on invidious racial classifications that discriminate against applicant investors on the basis of race. Defendants do not have any compelling government interest in Defendant Bally's discriminating among potential investors on the basis of their race. The government Defendants have not established that the program is narrowly tailored to target a specific episode of past or present discrimination. The program as administered allows affluent minority or female individuals, even those who reside in other states, to invest while excluding low-income white males residing in the Chicagoland area—indeed, all white males, of any income. This program appears to lack even the afterthought of narrow tailoring and simply cannot withstand strict scrutiny.

In addition to the race-based classification, which must be scrutinized under strict scrutiny, Defendants impose a sex-based classification under the terms of the Agreement. Although there is some debate over the appropriate level of scrutiny to be applied in sex-based classifications, *see id*. at 644 ("Another unresolved issue is whether a different, and specifically a more permissive, standard is applicable to preferential treatment on the basis of sex rather than race or ethnicity"), the Supreme Court has said that "for cases of official classification based on gender" "the reviewing court must determine whether the proffered justification is 'exceedingly persuasive.'"

*United States v. Virginia*, 518 U.S. 515, 532-33 (1996). The Supreme Court "has carefully inspected official action that closes a door or denies opportunity to women (or to men)." *Id*. "The State must show 'at least that the [challenged] classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.''" *Id*. (citations omitted). "The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation. And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Id*.

Defendants cannot demonstrate that discriminating on the basis of sex in ownership preference for this casino project is substantially related to achieving an important governmental interest. MCC 2-92-680(v) defines "woman" as "a person of the female gender, who is presumed to be socially disadvantaged." Such presumptions are inappropriate as overbroad generalizations about the capacities of males and females.

Defendants cannot show an "exceedingly persuasive justification" for excluding men, operatively only white men, from the Bally's IPO while permitting investment by white women residing in other states who may have never had any interaction with the City of Chicago at all. There is no "close match" between this so-called remedy and any particular past harm perpetrated by the City against the favored individuals.

Further, an appropriate alternative remedy must "provide equal opportunity." *See United States v. Virginia*, 518 U.S. at 534. Bally's is the only casino project in Chicago, and therefore there is no equal alternative for individuals like Plaintiff to participate as an investor.

Defendants cannot demonstrate that excluding only white men from ownership is substantially related to achieving an important government interest. The Qualification Criteria imposed by the City allows affluent white women in Texas or Florida to participate in Bally's IPO while

11

excluding low-income white men in Chicago; there is no important government interest accomplished by bringing about this state of affairs. Therefore, Plaintiff is likely to succeed on the merits of his claims related to sex and race-based discrimination.

### II. Without a preliminary injunction, Plaintiff will suffer irreparable harm and does not have an adequate remedy at law.

Unless enjoined, Defendants plan to move forward with distributing the IPO shares to their "qualified" applicants on February 7, 2025. Defendants' exclusion of Plaintiff from IPO participation based on his sex and race violates Plaintiff's constitutional rights, which alone constitutes manifest, irreparable harm. *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) ("It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))). Absent an injunction, Plaintiff will be excluded from participation in the IPO, and he will be unable to participate in ownership by purchasing shares on a secondary market because shares will not be "listed on any national securities exchange or on any other stock exchange, regulated trading facility or automated dealer quotation system in the United States or internationally." Transferability restrictions also require that the interests are only transferred to "Permitted Transferees" who meet the same minority qualifications as the initial purchasers of the IPO. Therefore, an injunction is necessary to halt the allocation and distribution of IPO interests under unconstitutionally exclusionary race and sex-based criteria. Absent an injunction, Plaintiff will retain no adequate remedy at law.

### III.   The balance of equities and public interest favor a preliminary injunction.

The public interest always favors the protection of constitutional rights—and the balance of equities here clearly favors injunctive relief. Plaintiff's requested injunction asks that this Court

order that Defendants be enjoined from moving forward with the final allocation and distribution of IPO shares until it can be determined whether the exclusionary criteria under which they plan to allocate and distribute the interests is permissible. Plaintiff simply asks that, as this case is litigated, Defendants pause the distribution of the IPO shares. Defendants have already collected the information of interested investors, and February 7 is merely a projected date for allocation and distribution among the applicants. It is also unknown whether Defendants received sufficient applications for the IPO to be fully subscribed. Additionally, the provisions of the Agreement give Defendants twelve months to achieve 25% minority ownership, demonstrating that it is not urgent for Defendants to distribute the shares to investors.

If the IPO goes forward while this case is litigated, Plaintiff will be excluded from the investor class, all but permanently, due to the aforementioned limits on secondary markets and transferability. And this is the only casino project in Chicago, so there is no equivalent alternative for Plaintiff to invest in.

As previously discussed, Plaintiff is likely to win on the merits of his claims that the Agreement imposes unconstitutional race and sex-based discrimination; government officials are not harmed by the issuance of a preliminary injunction which prevents the state from implementing a likely unconstitutional practice. *See Joelner v. Vill. of Wash. Park*, 378 F.3d 615, 620 (7th Cir. 2004) (government could suffer "no irreparable harm" from being "prevented from enforcing an unconstitutional statute"); *see also Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 191 (4th Cir. 2013) ("[A] state is in no way harmed by issuance of a preliminary injunction which prevents [it] from enforcing restrictions likely to be found unconstitutional."); *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (government "cannot suffer harm from an injunction that merely ends an unlawful practice").

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant the motion for Temporary Restraining Order and enjoin Defendants from completing the discriminatory IPO.

Dated: January 31, 2025

        Respectfully submitted,

                Mark Glennon

                By: <u>Reilly Stephens</u>
            One of his Attorneys

                Reilly Stephens
                Bridget Conlan (IL Bar 6348769)
                Liberty Justice Center
                7500 Rialto Blvd., Suite 1-250
                Austin, TX 78735
                (512) 481-4400
                rstephens@ljc.org
                bconlan@ljc.org