### In the United States District Court
### for the Northern District of Illinois
### Eastern Division

MARK GLENNON,

    Plaintiff,

        v.

BRANDON JOHNSON, in his official capacity, as Mayor of Chicago; MELISSA CONYEARS-ERVIN, in her official capacity as Chicago City Treasurer; CITY OF CHICAGO; CHARLES SCHMADEKE, SEAN BRANNON, STEPHAN FERRARA, and DIONNE HAYDEN, in their official capacity as Chairman and Members of the Illinois Gaming Board; BALLY'S CHICAGO INC.; BALLY'S CHICAGO OPERATING COMPANY, LLC; and BALLY'S CORPORATION,

    Defendants.

No. 1:25-cv-1057

Judge Franklin U. Valderrama

### Order

For decades the idea of a land-based casino in Chicago has been nothing but a dream for many. With the passage of the Illinois Gambling Act, 230 ILCS 10/1, *et seq*, that dream turned into a genuine possibility. Defendant City of Chicago (the City) selected Defendant Bally's Chicago Inc. (Bally's)[1] to build and operate the casino. On the eve of Bally's Initial Public Offering (IPO), Plaintiff Mark Glennon (Glennon), a

---

[1] Along with Bally's Chicago Inc., Glennon sued Bally's Chicago Operating Company, LLC and Bally's Corporation. The Court will refer to these Defendants collectively as "Bally's."

white male, filed a lawsuit claiming that Bally's and the City[2] discriminated against him on the basis of race and sex in violation of, among other rights, the Fourteenth Amendment. R. 1, Compl. ¶ 1.[3] Glennon's constitutional claims are based on his allegation that Bally's did not allow him to participate in its IPO due to the IPO's race/ethnicity and gender restrictions as to who is allowed to purchase stock. *Id*. ¶ 3. Glennon has also filed a Motion for a Temporary Restraining Order and Preliminary Injunction (the Motion), which is presently before the Court. R. 5. In the Motion, Glennon seeks emergency relief and asks the Court to enjoin the IPO's distribution of shares, set to take place on February 7, 2025. *Id*. As set forth below, the Court denies the Motion, as Glennon fails to establish his likelihood of success on the merits and that he will suffer irreparable harm absent an injunction.

## Background[4]

In 2021, the City began soliciting proposals to compete for the right to develop the first integrated casino resort in the City, pursuant to the Illinois Gambling Act, 230 ILCS 10/1, *et seq*, (the Gambling Act) which allows the City to issue a single casino owner's license to a selected applicant. R. 6, Pl.'s Memo. at 2. The Gambling

---

[2]Glennon has also sued Brandon Johnson, in his official capacity as Mayor of Chicago; Melissa Conyears-Ervin, in her official capacity as Chicago City Treasurer; Charles Schmadeke in his official capacity as Chairman of the Illinois Gaming Board; and Sean Brannon, Stephan Ferrara, and Dionne Hayden in their official capacities as Members of the Illinois Gaming Board.

[3]Citations to the docket are indicated by "R." followed by the docket number and, where necessary, a page or paragraph citation.

[4]The background is derived from the well-pled allegations of the complaint, along with Glennon's Motion (R. 5), Glennon's Memorandum of Law and accompanying exhibits (R. 6), the City's Response (R. 17), and Bally's Response (R. 18).

Act also requires that any applicant for a casino owners' license demonstrate it "used its best efforts to reach a goal of 25% ownership representation by minority persons and 5% ownership representation by women." 230 ILCS 10/6(a-5)(9). The City eventually selected Bally's proposal, after which they entered into a Host Community Agreement (the Agreement). Compl. ¶¶ 17, 19. To satisfy the standards of the Gambling Act, the Agreement requires in pertinent part that:

> 25% of the Project equity will be owned by Minority individuals and Minority-Owned and Controlled Businesses no later than twelve months following commencement of the Term or such later date as may be determined by the City, and will continue for no less than five years thereafter. Additionally, the Developer shall provide commercially reasonable efforts to locate qualified Minority individuals or Minority-Owned and Controlled Businesses who wish to buy an interest in Developer in an effort to assist any Minority individuals or Minority-Owned and Controlled Businesses who may wish to sell their interest in Developer.

Pl.'s Memo., Exh. B, Agreement, at 115. The Agreement defined "Minority" pursuant to MCC 2-92-670(n), which defines "Minority" as including but not limited to "African Americans, Hispanics, Asian Americans, and American Indians. The Agreement further defined "Minority" to include women. *Id*. The Agreement defined "Minority-Owned and Controlled Businesses" as "a business that is at least 51 percent owned by one or more Minority persons, or in the case of a publicly-held business, at least 51 percent of all classes of the stock of which is owned by one or more Minority persons[.]" *Id*.

Bally's, to meet this 25% minority ownership requirement of the Agreement, has registered an IPO with the Securities and Exchange Commission (SEC) of 10,000 shares. Bally's has restricted participation in this IPO to investors who meet their

Qualification Criteria, which mirrors the definitions of "Minority" and ""Minority-Owned and Controlled Businesses" as provided in the Agreement. Bally's also placed further restrictions on its IPO that are relevant here. The IPO limited the ability of individuals who purchased shares to later transfer those shares, requiring that shares be transferred only to individuals/entities that meet the Qualification Criteria, or transferred back to Bally's itself. Pl.'s Memo, Exh. A, IPO Prospectus, at 406. Further, Bally's IPO Prospectus states that Bally's will not be offering further shares for sale and intends on retaining 75% ownership of the casino. IPO Prospectus at 102.

On January 24, 2025, Glennon applied to participate in the IPO and was denied because he did not meet the Qualification Criteria. Compl. ¶ 32. On January 30, 2025, Glennon filed this suit alleging Fourteenth Amendment race and sex discrimination claims under 42 U.S.C. §§ 1981 and 1983 (Counts I and II) and a claim under 42 U.S.C. § 1982 (Count III) for interference with his "equal right to purchase, hold, and convey property[.]" Compl. ¶¶ 33–65. One day later, Glennon filed his Motion against Defendants. Glennon asks the Court to enjoin Bally's from proceeding with the IPO, which is set to close on February 7, 2025. Pl.'s Mot. ¶¶ 3–4. The fully briefed Motion is before the Court.

## Legal Standard

The standard for obtaining a temporary restraining order (TRO) is the same as that required to issue a preliminary injunction. *See Merritte v. Kessel*, 561 Fed. Appx. 546, 548 (7th Cir. 2014). "Temporary restraining orders and preliminary injunctions, are extraordinary and drastic remedies that should not be granted unless

the movant, by a clear showing, carries the burden of persuasion." *Elim Romanian Pentecostal Church v. Pritzker*, 613 F. Supp. 3d 1102, 1107 (N.D. Ill.), *aff'd*, 962 F.3d 341 (7th Cir. 2020) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). A plaintiff seeking a TRO or preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "The two most important considerations are likelihood of success on the merits and irreparable harm." *Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1188 (7th Cir. 2023). If the plaintiff establishes both of these threshold requirements, the court must then weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant that will issue from an injunction. *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (cleaned up).[5]

The Seventh Circuit has described this balancing test as a "sliding scale:" "if a plaintiff is more likely to win, the balance of harms can weigh less heavily in its favor, but the less likely a plaintiff is to win[,] the more that balance would need to weigh in its favor." *GEFT Outdoors*, 992 F.3d at 364 (cleaned up). Finally, in balancing the harms, the court must consider the interests of non-parties in granting or denying the requested relief. *Ty, Inc., v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).

---

[5]This Order uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

In resolving a motion for TRO, the Court reviews the record from a "neutral and objective viewpoint" without accepting Glennon's allegations as true, nor drawing reasonable inferences in Glennon's favor. *Doe v. University of Chicago*, 2022 WL 16744310, at *2 (N.D. Ill. Nov. 7, 2022) (citing *Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791 (7th Cir. 2022)). The Court must "make factual determinations on the basis of a fair interpretation of the evidence before the court" at this stage. *Darryl H. v. Coler*, 801 F.2d 893, 898 (7th Cir. 1986). However, the findings are only preliminary, and "do not bind the district court as the case progresses." *Mich. v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 782 (7th Cir. 2011).

## Analysis[6]

### I. Likelihood of Success on the Merits

#### A. Glennon's Claims Against Bally's

The Court begins its analysis with whether Glennon has established a likelihood of success on the merits against Bally's.

In his Complaint, Glennon asserts a Fourteenth Amendment race discrimination claim under 42 U.S.C. §§ 1981 and 1983 (Count I); a sex discrimination claim under 42 U.S.C. §§ 1981 and 1983 (Count II); and a claim under 42 U.S.C. § 1982 for interference with his "equal right to purchase, hold, and convey property[.]" (Count III). Compl. ¶¶ 33–65. Glennon's Motion, however, is only based on his claims brought under § 1983, as he argues that Bally's is a state actor (required under

---

[6]In deciding Glennon's Motion, the Court considered Glennon's Motion (R. 5), Glennon's Memorandum of Law and accompanying exhibits (R. 6), the City's Response (R. 17), Bally's Response (R. 18), Bally's Declarations (R. 19, 20) and Glennon's Reply (R. 22).

§ 1983) and makes no mention of either § 1981 or § 1982 in either his opening memorandum or his reply. Therefore, the Court finds that Glennon has waived any argument that he is entitled to a TRO based on Bally's alleged violations of §§ 1981 or 1982. *See Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 704 (7th Cir. 2010) ("[I]t is not this court's responsibility to research and construct the parties' arguments, and conclusory analysis will be construed as waiver."); *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021) ("perfunctory and undeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived."). Accordingly, the Court analyzes Glennon's Motion within the framework of § 1983.

To establish a likelihood of success on the merits, the movant need not show that it will unquestionably win the case. *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). However, a mere "possibility of success is not enough" and "neither is a better than negligible chance." *Id.* at 762 (cleaned up). A strong showing of likelihood of success on the merits normally includes the movant showing how he or she proposes to prove the key elements of its case. *Id.* at 763.

Glennon brings Fourteenth Amendment race and sex discrimination claims under 42 U.S.C. § 1983, asserting that Defendants are unconstitutionally discriminating on the basis of race and sex. More specifically, Glennon argues that through the terms of their Agreement, Bally's and the City have acted together to discriminate against him "by excluding him from participation in the Bally's IPO simply because he is white and male." Pl.'s Memo. at 6.

7

42 U.S.C. § 1983 is not itself a source of liability. *Narducci v. Moore*, 572 F.3d 313 (7th Cir. 2009). "Instead, it creates a cause of action for the 'deprivation, under color of [state] law, of a citizen's rights, privileges, or immunities secured by the Constitution and laws of the United States." *Id*. at 318-19. That is, 42 U.S.C. § 1983 is a vehicle for vindicating rights furnished elsewhere. *Hallinan v. Fraternal Ord. of Police of Chicago Lodge No. 7*, 570 F.3d 811, 815 (7th Cir. 2009) (constitutional rights are "redressable through 42 U.S.C. § 1983.").

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws," U.S. Const. amend. XIV, and "protect[s] citizens from conduct by the government, but not from conduct by private actors, no matter how egregious that conduct might be." *Hallinan*, 570 F.3d at 815 (citing *Nat'l Collegiate Athletic Ass'n v. Tarkanian,* 488 U.S. 179, 191, (1988) ("Embedded in our Fourteenth Amendment jurisprudence is a dichotomy between state action, which is subject to scrutiny under the Amendment's Due Process Clause, and private conduct, against which the Amendment affords no shield, no matter how unfair that conduct may be.")). Although Bally's is a private entity, "the conduct of private actors, in some cases, can constitute state action." *Id*. Therefore, to establish a likelihood of success on the merits, Glennon must plausibly show that Bally's, in applying race and sex-based restrictions to its IPO, engaged in state action. *Scott v. Univ. of Chicago Med. Ctr.*, 107 F.4th 752, 757 (7th Cir. 2024) (42 U.S.C. § 1983 "liability only extends to private parties when they act under color of state law.").

The Seventh Circuit, following in the footsteps of the Supreme Court, has identified several scenarios in which a private entity can be considered a state actor:

> Private action can become state action when private actors conspire or are jointly engaged with state actors to deprive a person of constitutional rights; where the state compels the discriminatory action; when the state controls a nominally private entity; when it is entwined with its management or control; when the state delegates a public function to a private entity; or when there is such a close nexus between the state and the challenged action that seemingly private behavior reasonably may be treated as that of the state itself.

*Hallinan*, 570 F.3d at 815 (cleaned up). These scenarios, however, do not constitute a test or series of factors. *Scott*, 107 F.4th at 757. Instead, they "demonstrate examples of outcomes in a fact-based assessment." *Hallinan*, 570 F.3d at 815.

Glennon argues that Bally's is a state actor through the Agreement with the City, stating that Bally's is compelled to discriminate "to fulfill the government's discriminatory policy goals," and that its actions are "inextricably intertwined with those government policies." Pl.'s Memo. at 7. Glennon maintains that the Agreement between the City and Bally's imposes a 25% minority ownership requirement on Bally's, which, if not implemented, "would constitute an Event of Default by Bally's, entitling the City to terminate the Agreement[.]" Pl.'s Memo. at 7. Glennon notes that Bally's implemented the minority ownership requirement by limiting its IPO to individuals who meet "Class A Qualification Criteria," which includes, but is not limited to, women, African Americans, Hispanics, Asian Americans, and American Indians. *Id*. Glennon contends that Bally's discriminatory limitations on who may purchase shares of its IPO constitute state action because (1) the City compelled Bally's discriminatory limitations on threat of terminating the Agreement and (2) the

discriminatory limitations are "inextricably intertwined with [the City's discriminatory] government policies." *Id*.

Bally's disagrees. From Bally's perspective, complying with the 25% minority ownership requirement does not turn it into a state actor. R. 18, Bally's Resp. at 6 (citing *Scott*, 107 F.4th at 760) ("Mere compliance with state regulations or guidelines cannot transform a private entity into a state actor.")). Bally's further contends that Glennon has failed to engage in the "fact-intensive" analysis required of the state action inquiry and has thus failed to establish a likelihood of success on the merits. *Id*.

On the record before it, the Court agrees with Bally's that Glennon fails to plausibly allege that Bally's implementation of discriminatory limitations on its IPO constitutes state action.

First, the Court disagrees with Glennon's contention that, through the Agreement, the City compelled Bally's to "discriminate to fulfill the government's discriminatory policy goals." Pl.'s Memo. at 7. True, the Agreement imposed a 25% minority ownership requirement on Bally's. Pl.'s Memo., Exh. B, Agreement at 115. And Glennon is correct that if Bally's did not attempt to reach the 25% minority ownership requirement, the City may consider such conduct an Event of Default, entitling it to terminate the Agreement. Agreement at 42–43. However, contrary to Glennon's assertion that "[t]he requirements of the Agreement operate to specifically exclude white males from ownership participation," Pl.'s Memo. at 6, the Agreement did no more than set a minority ownership requirement. The Agreement did not set

10

forth any mandates regarding how Bally's must reach this requirement, and it certainly did not mandate that Bally's reach this requirement through discriminatory limitations on who can participate in its IPO. *See id.* at 115.

Rather, the Agreement left it wholly to Bally's to decide how to reach the 25% minority ownership requirement. Bally's, of its own volition, decided the best way to achieve the requirement was to limit who could purchase shares and participate in the IPO. *See* Pl.'s Memo., Exh. A, IPO Prospectus at 392 ("The Qualification Process"). Further, it was Bally's—not the City—that decided to implement the additional restrictions that Glennon asserts prevent him from ever purchasing shares: the City did not direct Bally to limit the transfer of shares to an individual/entity that meets the Qualification Criteria and the City did not direct Bally's to withhold further shares from sale and to retain 75% ownership. *See* IPO Prospectus at 406 (providing that shares can only be transferred, with or without Bally's consent, to individuals meeting the Qualification Criteria or back to Bally's); IPO Prospectus at 102 ("Class B Interests are not being offered hereby, and will be held exclusively by Bally's Chicago HoldCo.").

To reiterate, there is no question the City required Bally's to reach 25% minority ownership at risk of the City terminating the Agreement. However, the 25% minority ownership requirement does not itself prohibit Glennon from purchasing ownership shares. Requiring Bally's to *include* certain classes of people in ownership is a far cry from requiring Bally's to *exclude* certain classes of people from ownership. The Agreement provided Bally's with significant flexibility in determining a strategy

to best reach the ownership requirement. Bally's—and Bally's alone—chose a strategy that excluded Glennon and others who did not meet the Qualification Criteria from purchasing an ownership stake.

The Court also disagrees with Glennon that Bally's actions are "inextricably intertwined" with the City's requirement that it reach 25% minority ownership. Glennon's assertion here is cursory, and he provides no authority outlining the contours of when such entwinement occurs, or specific facts to even support a finding of entwinement. To the extent that Glennon's argument is based on the implementation of Bally's allegedly discriminatory IPO limitations due to the City's 25% minority ownership requirement, it fails. The "entwinement" theory of state action "is premised on whether the entities are *actually* entwined . . . working together is not enough." *Scott*, 107 F.4th at 761. Rather, private action transforms into state action when "the relevant facts show pervasive entwinement to the point of largely overlapping identity[.]" *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 303 (2001); *see also Scott*, 107 F.4th at 761 (same).

For example, in *Brentwood*, 531 U.S. at 299–300, a 42 U.S.C. § 1983 claim was allowed to proceed against a private athletic association (the Association) where 84% of its membership was composed of "public schools represented by their officials acting in their official capacity to provide an integral element of secondary public schooling." *Id.* at 299. Finding "[t]here would be no recognizable Association" absent public actors and action, the Supreme Court found entwinement sufficient to attribute the actions of the Association to the state. *Id.* at 300. Glennon does not put

forth any facts establishing such a level of interdependence between the City and Bally's, and therefore the Court cannot find Bally's engaged in state action under this theory.

Recall that under 42 U.S.C. § 1983, the Fourteenth Amendment "affords no shield" against private discriminatory conduct. *Nat'l Collegiate Athletic Ass'n,* 488 U.S. at 191. "Drawing a line between private and governmental conduct preserves an area of individual freedom by limiting the reach of federal law, avoids the imposition of liability on a state for actions outside its control, and assures that constitutional standards are invoked only when the state is responsible for the conduct about which the plaintiff complains." *Lindsey v. Detroit Ent., LLC*, 484 F.3d 824, 827 (6th Cir. 2007). No matter the fairness or wisdom of Bally's chosen method to reach 25% minority ownership, the Court cannot issue a TRO or preliminary injunction enjoining the distribution of shares where Glennon has failed to meet his burden of adequately pleading that Bally's alleged discriminatory limitations are "fairly attributable to the state." *See Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 947 (1982); *cf. Scott v. Univ. of Chicago Med. Ctr.*, 107 F.4th 752, 757 (7th Cir. 2024). Without doing so, he fails to establish a likelihood on the merits on his 42 U.S.C. § 1983 race and sex discrimination claims.

## B. Glennon's Claims Against The City

The City argues that Glennon cannot seek injunctive relief against the City as it is not the party conducting the IPO and is therefore an improper party for injunctive relief. R. 17, City Resp. at 4–5. Turning to the substance of Glennon's

arguments, the City maintains the Court should deny the Motion because Glennon fails to show a likelihood of success on the merits for several reasons. First, the City asserts that Glennon "points to nothing in the [Agreement] that 'compelled' Bally's to issue the IPO, so as to transform the IPO into an act of the government." *Id*. at 7. Second, the City characterizes Glennon's contention that Bally's IPO restrictions are "inextricably intertwined" with the City's government policies as conclusory, as Glennon "does not point to any assistance from the City with respect to issuing the IPO such that the City should be deemed to be a joint actor in the IPO offering." *Id*. at 8.

The Court agrees with the City that it is an improper party for injunctive relief. Nothing in Glennon's Complaint suggests that the City is the entity issuing the IPO, which is the action Glennon seeks to enjoin. As the City is not involved in issuing the IPO, it "would [not] be responsible for ensuring that any injunctive relief is carried out," and therefore cannot be subjected to the injunction. *Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011) (citing *Feit v. Ward,* 886 F.2d 848, 858 (7th Cir.1989)).

The City also correctly argues it cannot be held liable for the IPO because Bally's issued the IPO as a private actor. As the City notes, the Agreement "contains a provision setting a 25% minority ownership commitment by Bally's Chicago, Inc., but it does not reference an IPO—much less this particular IPO—as the means by which to achieve it." City Resp. at 6. Accordingly, the IPO cannot be the basis for

14

Glennon's constitutional claims against the City. Glennon has therefore failed to demonstrate a likelihood of his claims' success against the City.[7]

Since Glennon has failed to establish his likelihood of success on the merits against either Bally's or the City, the Court could end its analysis here. However, for the sake of completeness, the Court addresses whether Glennon has demonstrated that he will suffer irreparable harm if the IPO shares are distributed.

## II. Irreparable Harm

As stated above, in addition to showing a likelihood on the merits, a party seeking a TRO must also show that, absent an injunction, he or she likely will suffer irreparable harm. *See Orr v. Shicker*, 953 F.3d 490, 502 (7th Cir. 2020). "'Harm is irreparable if legal remedies are inadequate to cure it,' meaning 'the remedy must be seriously deficient as compared to the harm suffered.'" *Bevis v. City of Naperville, Illinois*, 657 F. Supp. 3d 1052, 1076 (N.D. Ill. 2023), *aff'd*, 85 F.4th 1175 (7th Cir. 2023) (quoting *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021)).

Glennon posits he will suffer irreparable harm once the IPO distributes shares because upon this distribution, he will be fully excluded from the IPO. According to Glennon, he would effectively be excluded for two reasons: (1) he will be unable to purchase shares on a secondary market because the shares will not be "listed on any national securities exchange or on any other stock exchange, regulated trading

---

[7]The City also argues that Glennon's challenge to the Agreement is time barred because the statute of limitations for 42 U.S.C. § 1983 claims is two years and the Agreement was executed over two years ago. City Response at 8. However, because the Court has found that Glennon has not established a likelihood of success on the merits against the City, the Court need not address this argument.

facility or automated dealer quotation system in the United States or internationally;" and (2) individuals who purchase IPO shares are prohibited from transferring shares to Glennon because he does not meet the Qualification Criteria. Pl.'s Memo. at 12 (citing IPO Prospectus at 390, 406). In Glennon's view, his exclusion from the IPO due to his race and sex amounts to a constitutional violation, "which alone constitutes manifest, irreparable harm." *Id.* (citing *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009)).

Bally's raises three arguments in response. First, Bally's contends that Glennon's alleged injury—being excluded from the IPO investor class[8]—can be remedied by money damages, thereby precluding Glennon from establishing irreparable harm. Bally's Resp. at 11 (citing *D.U. v. Rhoades*, 825 F.3d 331, 339 (7th Cir. 2016)). Second, Bally's maintains that Glennon's "unwarranted delay in bringing this TRO further belies his contention that he will suffer irreparable harm," given Glennon has followed the Bally's IPO since its genesis, yet "waited until the eve of the closing of the IPO to ask this Court for 'emergency' relief." *Id.* at 14. Last, Bally's challenges Glennon's claim that a constitutional violation amounts to *per se* irreparable harm, arguing that the law in no way supports the notion that "every episodic claim of racial discrimination automatically establishes irreparable harm." *Id.* at 15.

---

[8]Bally's also asserts that Glennon has no true interest in purchasing shares, citing to his multiple public statements decrying the IPO as a bad investment. Bally's Response at 12–13. The Court declines to consider these statements in resolving Glennon's motion.

The City also responds to Glennon's claim of irreparable harm, albeit cursorily, arguing that Glennon "provides no reason why the investment avenue afforded by the IPO is anything but a financial opportunity" and that "damages would suffice to make him whole." (citing *Orr v. Shicker*, 953 F.3d 490, 502 (7th Cir. 2020) (defining "irreparable harm" as harm "for which money compensation is inadequate")).

## A.     Glennon Did Not Unreasonably Delay Seeking Relief

As a threshold matter, Bally's argues that Glennon's delay in moving for a TRO severely undermines Glennon's claim of imminent irreparable harm, and that such a delay precludes a finding of such harm.

In support of this argument, Bally's sets forth the relevant timeline: (1) the City first outlined the diversity requirements of the casino project in the summer of 2021, R. 19, Rael Declaration, ¶ 7; (2) the Agreement between the City and Bally's, which included the minority ownership requirements, was publicly released in June 2022, *id.*; (3) Bally's first announced its IPO and its plan to satisfy the minority ownership requirements in May 2023, R. 20, Jewett Declaration, ¶ 26; and (4) Bally's filed its IPO with the SEC on December 27, 2024, Rael Declaration, ¶ 7. Bally's contends that Glennon's "online publication shows that he closely followed this history," yet Glennon "waited until the eve of the closing of the IPO to ask this Court for 'emergency' relief." Bally's Resp. at 14.

Although Bally's traces Glennon's knowledge of the City's minority requirements back to 2021 and his knowledge of the IPO restrictions back to May 2023, Rael Declaration ¶ 7, Glennon arguably first obtained standing to bring this

suit on December 27, 2024, the day Bally's filed the official terms and conditions of its IPO, which contained the minority ownership requirements, with the SEC. However, Bally's has not provided evidence demonstrating that Glennon has had actual knowledge of the IPO's official terms and conditions since December 27, 2024. In his declaration on behalf of Bally's, Lucas Thor Rael provides a list of articles, published by Glennon's online publication Wirepoints, in an effort to establish the timeline of Glennon's knowledge. According to Rael's Declaration, Glennon's first publication related to the IPO's official terms and conditions came on January 6, 2024. *See Bally's warns investors that "heightened criminality or the perception of danger" could torpedo its Chicago casino*, WIREPOINTS (Jan. 6, 2025), https://wirepoints.org/ballys-warns-investors-thatheightened-criminality-or-the-perception-of-danger-could-torpedo-it-chicago-casino-cwbchicago/ (last visited Feb. 6, 2025). However, that article was wholly unrelated to the issues in this case and does not provide any proof that Glennon had actual knowledge of all official terms and conditions of the IPO.

Proof that Glennon had become aware of the IPO's official restrictions did not come until January 18, 2025. *See Chicago's Black residents invest in Bally's Casino – The Triibe*, WIREPOINTS (Jan. 18, 2025), https://wirepoints.org/chicagos-black-residents-can-invest-in-ballys-casino-the-tribe/ (last visited Feb. 6, 2025). Further, based on Glennon's counsel's representations during the February 4, 2025 telephonic hearing, Glennon retained counsel on January 29, 2025. Glennon's counsel then promptly filed the Motion two days later. On these facts, the Court does not find that

Glennon's delay in seeking relief is unreasonable or that any purported delay precludes a finding of irreparable harm. *C.f. Traffic Tech, Inc. v. Kreiter*, 2015 WL 9259544, at *17 (N.D. Ill. Dec. 18, 2015) (three-month delay precluded relief); *Ixmation, Inc. v. Switch Bulb Co., Inc.*, 2014 WL 5420273, at *8 (N.D. Ill. Oct. 23, 2014) (seven month delay precluded relief); *Johnson Publ'g, Co., Inc. v. Willitts Designs Int'l, Inc.,* 1998 WL 341618, at *8 (N.D. Ill. June 22, 1998) (four month delay weighed against granting preliminary injunction); *Stokley–Van Camp, Inc. v. Coca–Cola Co.,* 1987 WL 6300, at *3 (N.D. Ill. Jan. 30, 1987) ("three month[ delay] indicates a lack of a need for the extraordinary remedy of a preliminary injunction").

## B. Glennon Does Not Establish Irreparable Harm Through His Alleged Constitutional Violations

Turning to the substance of Glennon's claim of irreparable harm, Glennon's Motion premises that claim solely on the contention that a violation of constitutional rights amounts to *per se* irreparable harm. Pl.'s Memo. at 12. Bally's retorts that "[n]o binding precedent . . . establishes that a deprivation of *any* constitutional right is presumed to cause irreparable harm." Bally's Resp. at 14–15 (quoting *Bevis*, 657 F. Supp. 3d at 1076). Further, argues Bally's, not *every* claim of racial discrimination automatically establishes irreparable harm. *Id*. at 15.

Glennon relies on two non-binding cases in support of his argument that the alleged violation of his constitutional rights based on sex and race discrimination constitutes *per se* irreparable harm: *Mills v. District of Columbia*, 571 F.3d 1304 (D.C.

Cir. 2009) and *Faust v. Vilsack*, 519 F. Supp. 3d 470 (E.D. Wis. 2021).[9] The Court examines each in turn.

In *Mills*, the plaintiffs filed a class action lawsuit against the District of Columbia (the District), claiming the District subjected them to unconstitutional seizures in violation of their Fourth Amendment rights based on a police checkpoint program in the plaintiffs' neighborhood. 571 F.3d at 1306. They moved for a preliminary injunction to enjoin further implementation of the program. *Id*. The District of Columbia Circuit found the plaintiffs had "sufficiently demonstrated irreparable injury, particularly in light of their strong likelihood of success on the merits." *Id*. at 1312. Citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976), the court found that "the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills*, 571 F.3d at 1306.

As an initial matter, the Court finds *Mills* distinguishable[10] because here, unlike in *Mills*, Glennon did not make a showing of a "strong likelihood of success on the merits." 571 F.3d at 1312; *see supra* Section I. Even putting that aside, the Court respectfully disagrees with *Mills* to the extent that it stands for the proposition that *any* alleged constitutional violation in and of itself, including an allegation of race or

---

[9]Glennon first cited to *Faust v. Vilsack*, 519 F. Supp. 3d 470 (E.D. Wis. 2021) in his Reply. R. 22, Pl.'s Reply at 2.

[10]Bally's attempts to distinguish *Mills* on the basis that the alleged constitutional violation would reoccur, whereas here, the IPO will only occur once. Bally's Resp. at 15. In *Mills*, the likelihood of reoccurrence was important because the checkpoint was not currently in effect, leaving potential for future harm. 571 F.3d at 1312. Similarly, the IPO here has not yet occurred, so there is the possibility of future harm. The Court does not find Bally's argument persuasive, but nonetheless declines to follow *Mills* for the reasons discussed above.

sex discrimination, *automatically* constitutes irreparable harm. As stated above, *Mills* relied on *Elrod* in support of that finding. *Elrod*, however, was limited to First Amendment violations. *See* 427 U.S. at 373 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *see also Int'l Ass'n of Fire Fighters, Loc. 365 v. City of E. Chicago*, 56 F.4th 437, 450–51 (7th Cir. 2022) ("Under Seventh Circuit law, irreparable harm is presumed in First Amendment cases.").

The only other case cited by Glennon, *Faust*, which is a non-binding in-Circuit case, does not convince the Court otherwise. In *Faust*, plaintiffs filed a lawsuit seeking to enjoin the United States Department of Agriculture from implementing a loan-forgiveness program for which eligibility was based "solely on racial classifications." 519 F. Supp 3d at 473. The court rejected the defendants' argument that "racial discrimination inflicts no harm at all." *Id*. at 476. But, contrary to Glennon's contention, it did not find that the alleged racial discrimination, *on its own*, established irreparable harm. Rather, plaintiffs' exclusion from the loan forgiveness program and the likely resulting financial harm also supported a finding of irreparable harm. *Id*. at 476–77. Moreover, the court noted that the plaintiffs could not seek monetary damages in light of the defendants' sovereign immunity, further supporting irreparable harm. *Id*. at 477. Finally, like *Mills*, the court's finding of irreparable harm was predicated upon a finding that "[p]laintiffs have established a strong likelihood that [the loan forgiveness program] is unconstitutional[.]" *Id*. at 477. As discussed above, the Court has found that Glennon has not established a likelihood

of success on the merits. Accordingly, the Court finds that Glennon has failed to demonstrate that his allegations of race and sex discrimination establish *per se* irreparable harm.

In sum, the Court finds that Glennon has not established that irreparable harm will occur on the basis of Bally's or the City's alleged constitutional violations alone. The Court lastly turns to Glennon's argument that the result of the alleged discrimination—his inability to buy stock—irreparably harms him.

### C.    Glennon Does Not Establish Irreparable Harm Through Loss of the "Intrinsic Value" of Ownership

In his Reply, Glennon—for the first time—addresses whether the availability of monetary damages precludes a finding of irreparable harm. Generally, the Court would not consider an argument or case asserted for the first time on reply. *See Narducci v. Moore*, 572 F.3d 313, 323 (7th Cir. 2009). However, Glennon's argument can reasonably considered raised in response to Bally's contention that his alleged harm is fully compensable through money damages. For that reason, and for the sake of completeness, the Court will consider it.

Glennon does not argue that monetary damages cannot adequately compensate him for the loss of the financial opportunity the IPO presents. Rather, Glennon posits that monetary damages cannot adequately compensate the loss of "the intrinsic value of owning a share of the only casino in Chicago." Pl.'s Reply at 3. This loss of "intrinsic value," Glennon argues, cannot be compensated by money because such intrinsic value is not fungible like money or a basic service in the marketplace.

22

*Id.* at 3 (citing *Jabateh v. Lynch*, 845 F.3d 332, 350 (7th Cir. 2017); *Acosta v. Bd. of Trustees of Unite Here Health*, 2024 WL 3888862, at *6 (N.D. Ill. Aug. 21, 2024)).

On the other hand, Bally's contends that "[t]he value of any stock or any future dividends is calculable and entirely redressable through money damages." Bally's Resp. at 11–12 (citing, *inter alia, W. Inv. LLC v. DWS Glob. Commodities Stock Fund, Inc.*, 705 F. Supp. 2d 281, 286 (S.D.N.Y. 2010) (value of shares is compensable through money damages); *First Lincoln Holdings, Inc. v. Equitable Life Assurance Soc'y*, 164 F. Supp. 2d 383, 392 (S.D.N.Y. 2001) (no irreparable harm because plaintiff's damages on missed opportunities to trade stocks were calculable); *BP Corp. N. Am. Inc. v. N. Tr. Invs., N.A.*, 2008 WL 5263695, at *4 (N.D. Ill. Dec. 16, 2008) (damages on lost investment opportunities "easily calculable" and comparable to an award of "prejudgment interest to compensate for lost investment opportunity")).

The Court finds that Bally's again has the better of the argument. The two cases to which Glennon cites bear no factual or legal relation to this case and lend no support to the notion that the loss of "intrinsic value" may constitute irreparable harm. *Jabatah* did not involve a motion for a TRO or preliminary injunction, but rather a petition to vacate the Board of Immigration Appeals' denial of the petitioner's application for asylum and withholding of removal. 845 F.3d at 333–34. The language cited by Glennon related to the notion that the translation services petitioner provided to an alleged terrorist were not fungible. *Id.* at 336, 350. Similarly, *Acosta* did not involve a TRO or preliminary injunction, and the cited language related to the court's analysis as to whether the plaintiff sufficiently stated a breach of fiduciary

duty claim based on the ERISA plan fiduciary's incurring of excessive administrative expenses. 2024 WL 3888862, at *4, *6. Neither case had anything to do with any sort of allegedly unique opportunity forming the basis of a TRO motion.

The credibility of Glennon's argument is brought into further question by the fact that, despite Glennon seeking emergency relief for this loss of "intrinsic value," allegations of such a loss appear nowhere in Glennon's complaint or Motion.

The Court finds that Glennon has neither demonstrated that his alleged injury is not financial in nature or shown that monetary damages can adequately compensate that injury. Glennon has repeatedly emphasized the violation here is his exclusion from *purchasing* shares and does not once assert that his inability to participate in the financial aspect of Bally's IPO cannot be redressed through pecuniary means. Accordingly, the Court agrees with Bally's that his alleged injury—his inability to purchase stock due to race and sex discrimination—is redressable through money damages. Bally's Resp. at 11–12. On this record, the Court cannot find that Glennon will suffer irreparable harm if Bally's IPO proceeds with its plan of distribution.

Because the Court finds that Glennon satisfies neither the likelihood of success on the merits nor the irreparable harm prongs of the preliminary injunction inquiry, it need not address the balance of harms or effects on non-parties. *See Saud v. DePaul Univ.*, 2019 WL 5577239, at *10 (N.D. Ill. Oct. 29, 2019).

## Conclusion

For the foregoing reasons, Glennon's Motion for a Temporary Restraining Order and Preliminary Injunction is denied. On or before March 6, 2025, the parties

24

shall file a joint initial status report. A template for the Joint Initial Status Report, setting forth the information required, may be found at http://www.ilnd.uscourts.gov/Judges.aspx by clicking on Judge Valderrama's name and then again on the link entitled "Joint Initial Status Report." The parties are further ordered to review all of Judge Valderrama's standing orders and the information available on his webpage. Any nongovernmental corporate party that qualifies under the Rules is reminded of the requirement to file a disclosure statement under Federal Rule of Civil Procedure 7.1/N.D. Ill. Local Rule 3.2.


Dated: February 6, 2025

_____
United States District Judge
Franklin U. Valderrama